This is an appeal from a jury verdict following a trial before Visiting Judge Thomas O. Matia. Appellants Virginia and Leon Manigault claimed that a defectively designed cruise control mechanism, in a 1987 automobile built by Appellee Ford Motor Company ("Ford"), malfunctioned, resulting in severe personal injuries to the couple. They claim it was error to exclude evidence of other complaints of sudden accelerations in Ford vehicles while allowing Ford to argue no similar event ever occurred. Ford seeks to protect the judgment and, by cross-assignment, contends it was entitled to a directed verdict because there was no evidence of a defect. We affirm.
On April 3, 1993, Leon Manigault, then 67 years old, and his wife, Virginia Manigault, then aged 63 years, got into their 1987 Ford Crown Victoria automobile to take a trip. The car, which had been driven over 110,000 miles by that time, was parked in the driveway of their Kempton Avenue home facing the street. Mr. Manigault turned on the ignition and the car suddenly accelerated out of the driveway, went across the street toward a narrow driveway between two houses, and crashed into one of them. Mrs. Manigault suffered a hip injury and Mr. Manigault sustained serious head injuries resulting in a persistent vegetative state.
The Manigaults filed a complaint against Ford and Mullinax Ford, their car dealer, but voluntarily dismissed that complaint.[1] The action was refiled on March 24, 1995, and returned to the docket of Judge Anthony O. Calabrese, Jr. The refiled complaint alleged negligent repair against Mullinax, and defective manufacture, defective design, negligence, and failure to warn claims against Ford, asserting that the accident was caused by a defective "idle air bypass" or other, unspecified defect. When Ford learned that the vehicle had been lost and was not available for its inspection, it raised the issue in a motion for summary judgment. The judge ordered the exclusion of evidence collected by the Manigaults' expert who had inspected the vehicle prior to its disappearance. This expert apparently had opined that the sudden acceleration was due to a faulty idle air bypass which later, the parties agreed, could not explain the rapid acceleration in this case, because a malfunction of the idle air bypass would result in a much more gradual acceleration than that claimed here.
The judge denied Ford's motion for summary judgment, and the case went to trial before the visiting judge.[2] The Manigaults' theory of liability did not refer to the idle air bypass, focusing instead on a claimed defect in the vehicle's cruise control system. According to the Manigaults' expert, Sam Sero, the cruise control was defective because electricity was supplied to it immediately upon ignition, instead of just when the system was engaged. In other words, the cruise control's on/off switch did not provide electrical power to the system, it only engaged its use. Because electrical power was always supplied, Sero maintained that a malfunction in the cruise control could result in a wide open throttle condition at any time.
Sero explained that the cruise control could cause a wide open throttle condition upon the occurrence of two events; a disconnection in the "speed amplifier" wire together with a short circuit in one of two other wires (the "vent" and "vacuum" lines). He claimed such malfunctions were likely to occur because components in the cruise control system are prone to loose connections, fraying, corrosion, nicked insulation, and dirt and water that can cause short circuiting. Sero, however, also maintained that, because the short circuit would be a random event, apparently occurring only when loose connections bounce out of place and moisture or contaminants create a temporary short circuit, such a malfunction would not be traceable. He then claimed that the cruise control should have been designed with an on/off switch that completely disconnected the system from the electrical supply, and would provide electric current only when engaged.
Ford argued that its cruise control system was not defectively designed because the occurrence of multiple electrical malfunctions within a cruise control system was highly unlikely and that such a malfunction would be traceable, at least in part, for such things as loose or broken connections, fraying, corrosion, and bare wires would be visible. It contended that Sero's claim of untraceability was intended only to overcome the fact that the Manigaults had failed to preserve the vehicle for testing, and, therefore, could not prove that any malfunction occurred. Ford also argued that even if an electrical cruise control malfunction occurred, the driver could shut down the throttle by applying the brake, which was equipped with a mechanical "dump valve" that would disengage the cruise control regardless of any electrical malfunction. On behalf of Manigault, Sero countered with testimony claiming that the wide open throttle would seriously reduce the amount of vacuum available for the power brakes, and it would be very difficult to apply the brakes without the vacuum assist.
The Manigaults' accident reconstructionist determined that the Manigaults' car traveled 187 feet before hitting the house and estimated its speed at impact between twenty-five and thirty-five miles per hour. Tests, using an intentionally short-circuited cruise control mechanism on another 1987 Ford Crown Victoria, showed that the vehicle would accelerate to a speed of between forty-five and fifty miles per hour over the same distance which, in the opinion of the reconstructionist, indicated that Mr. Manigault had applied the brakes at some point prior to impact. In addition, the Manigaults' son, John, testified that he observed that the car's brake lights were on immediately after the crash.
John Manigault also testified he observed an earlier sudden acceleration event with the car about six months prior to the accident in which it traveled about 1,000 feet before his father was able to stop it and that the car did not slow down or stop when the brake lights went on.
The Manigaults attempted to amend their witness list immediately before trial to include the deposition testimony of two Ford employees, Alan Updegrove and Charles Best, who had been deposed in a similar case. Their testimony was to show that Ford had received as many as thirty to forty complaints of sudden acceleration per month concerning cars similar to the 1987 Crown Victoria. The Manigaults also intended to present a letter from the National Highway Transportation Safety Association (NHTSA) to Ford, asking for information to aid in its investigation of 439 sudden acceleration complaints concerning Ford manufactured vehicles made between 1983 and 1986. The deposition testimony and the letter were admissible, the Manigaults contended, to show Ford's knowledge of the complaints. Ford countered that such evidence should be excluded because neither the letter nor the deposition testimony linked any of the complaints to a defect in the cruise control system of a Ford vehicle.
The trial judge agreed that the sudden acceleration complaints discussed in the letter and deposition testimony did not refer to "substantially similar" events, because a defective cruise control system had not been identified as the cause of any of the referenced events. The Manigaults then argued that such evidence should be allowed on rebuttal if Ford argued or introduced evidence that it had never received other complaints of sudden acceleration such as that experienced by them, but the judge excluded the evidence in its entirety.
During its opening statement, Ford claimed the evidence would show that the Manigaults would fail to prove any "real-world" verification of the defective cruise control. When Sero testified on the Manigaults' behalf, he was allowed to testify that he had investigated nine similar complaints concerning sudden accelerations in Ford cruise control systems identical to the one in question. Because the Manigaults also contended that Sero had personally collected Ford documents, indicating the existence of many more cruise control related acceleration events while it was investigating the other sudden acceleration cases, the judge invited them to proffer the documents but they failed to do so.
Ford's expert, Victor DeClercq, repeatedly referred to the fact that sudden acceleration events were known to occur, and that he and others at Ford had investigated complaints of sudden acceleration, including a number of complaints that precipitated a special investigation headed by Updegrove. DeClercq, however, denied that any of these sudden acceleration events had ever been linked to a defective cruise control and claimed that the theory advanced by Sero was practically impossible because it required two simultaneous electrical malfunctions (the broken connection together with a short circuit), as well as a failure of the mechanical dump valve that would disengage the throttle upon braking.
In closing arguments, the Manigaults argued that Ford was aware of sudden acceleration phenomena for many years prior to April 1993, and again referred to Sero's investigation of similar events as evidence of Ford's knowledge of the problem. Ford argued that, although DeClercq had investigated other sudden acceleration complaints, he had never found one related to a defective or malfunctioning cruise control. While Ford argued that there was "[n]o evidence that this has ever happened in any other vehicle at any time," the Manigaults countered in rebuttal by again reminding the jury that Sero had investigated nine such cases, and that Ford had assigned a special project to investigate a number of sudden acceleration complaints.
The jury found that Ford was not liable under either manufacturing defect, design defect, failure to warn, or negligence theories. The Manigaults filed a notice of appeal and a motion for relief from judgment under Civ.R. 60(B). After a number of procedural toe-stubbings, this court referred the matter back to Judge Calabrese, who granted the Manigaults' motion on the grounds that they had been prejudiced by the exclusion of the NHTSA letter and the depositions of Updegrove and Best, because that evidence supported their claim "that Ford has known that defects exist in its cruise control systems which cause sudden acceleration in stationary vehicles." He further found that Ford improperly informed the jury by stating that "there had never been a sudden unintended acceleration occurrence in hundreds of millions of vehicles equipped with cruise control systems[.]"
Ford appealed from the order granting the Civ.R. 60(B) relief, and this court reversed the judge's ruling, finding that the Manigaults' motion raised issues properly resolved in an appeal rather than a Civ.R. 60(B) motion. Manigault v. Ford Motor Co. (June 17, 1999), Cuyahoga App. No. 74266, unreported (Manigault I). This court then allowed reinstatement of the Manigaults' appeal.
Their first and second assignments of error state:
 I. THE MANIGAULTS WERE SUBSTANTIALLY PREJUDICED BY THE TRIAL COURT'S EXCLUSION DURING THEIR CASE IN CHIEF OF THE NHTSA CORRESPONDENCE AND THE UPDEGROVE/BEST DEPOSITIONS.
 II. THE TRIAL COURT ERRED BY DENYING THE MANIGAULTS THE RIGHT TO REBUT TESTIMONY AND STATEMENTS BY FORD TO THE JURY THAT THERE WERE NO OTHER INCIDENTS OF SUDDEN ACCELERATION INDICATING THE EXISTENCE OF A DESIGN DEFECT.
Through these assignments of error the Manigaults claim that evidence of other sudden acceleration events was improperly excluded, both during their case in chief and in rebuttal. Although much of the parties' arguments in this case focuses on whether the other sudden acceleration complaints were substantially similar to the event here, we must first clarify the nature of the evidence offered. Neither the NHTSA letter nor the depositions of Updegrove and Best were admissible to show a defect in Ford's cruise control system. Because these complaints were inadmissible hearsay if offered for unlimited purposes, the evidence was admissible, if at all, only for the limited purpose of showing that Ford had notice of other complaints of sudden acceleration. Babb v. Ford Motor Co., Inc. (1987), 41 Ohio App.3d 174, 535 N.E.2d 676, paragraph one of the syllabus. Had this evidence been admitted, Ford would have been entitled to a limiting instruction explaining to the jury that the complaints were not evidence of a defect, but that its knowledge of other complaints was relevant to the Manigaults' failure to warn claim. Id. at 177,535 N.E.2d at 679.
Although the Manigaults' complaint alleged both manufacturing and design defects, their trial presentation was exclusively directed at proving that Ford's cruise control system was unreasonably unsafe because of its design, which allowed sudden acceleration events to occur after predictable wear and tear on the vehicle resulted in electrical malfunctions within the system. In order to prove a design defect claim, a plaintiff must show that the product "is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or if the benefits of the challenged design do not outweigh the risk inherent in such design." Knitz v. Minster Machine Co. (1982), 69 Ohio St.2d 460, 432 N.E.2d 814, syllabus. Because notice is not part of the cause of action, the excluded evidence would not have helped the Manigaults prove the design defect claim.
They also claimed a failure to warn action against Ford, claiming that Ford had notice that its vehicles equipped with cruise control were prone to sudden acceleration events, and that consumers should have been warned of the possibility that the cruise control could malfunction and cause a sudden acceleration. A failure to warn claim does require proof that a defendant had knowledge of the product's danger, since "it must be proven that the manufacturer knew, or should have known, in the exercise of ordinary care, of the risk or hazard about which it failed to warn."Crislip v. TCH Liquidating Co. (1990), 52 Ohio St.3d 251, 257,556 N.E.2d 1177, 1182. Therefore the Manigaults could, arguably, be prejudiced by the exclusion of notice evidence but the record shows that the jury did hear evidence that Ford was aware of sudden acceleration phenomena prior to the Manigaults' accident through both Sero and Ford's expert, DeClercq. Admitting evidence of further complaints would have been cumulative, since none of them were admissible to show the existence of a defect. Furthermore, the Manigaults did not show that any of the other complaints of sudden acceleration were related to a defect in the cruise control system. At best the evidence showed only that Ford had notice of unexplained sudden acceleration complaints, and that it failed to give a general warning to all of its customers concerning the possibility of such an event.
The Manigaults claim that their evidence showed that there were only two explanations for their sudden acceleration event; cruise control malfunction or driver error. They contend that because the evidence conclusively ruled out the possibility of driver error in this case, and the number of complaints made to Ford rules out the possibility that all of them could have been due to driver error, the only remaining possibility in both this case and in many of the other complaints is cruise control malfunction. We disagree on both counts.
The most common driver error is mistaken application of the accelerator pedal instead of the brake, and Ford also presented evidence that Mr. Manigault might have suffered from some type of brain event that caused him to have a seizure or lose consciousness while driving. On the evidence presented, the jury could reasonably conclude that Mr. Manigault mistakenly stepped on the accelerator pedal. Similarly, there is no reason to believe that any other case of sudden acceleration was caused by a defective cruise control system, rather than driver error, without some evidence showing a cruise control malfunction. A defect is not proven simply because complaints are made and the Manigaults had a duty to show the link between such cruise control malfunction and sudden acceleration. They failed to show that loose connections and short circuits in cruise control systems had caused sudden accelerations in any vehicle, including their own. Ford, therefore, could not be held responsible for failing to warn consumers about such dangers of its cruise control system.
Because the excluded evidence was unnecessary to prove the Manigaults' design defect claim, and was insufficient to show Ford's awareness of a defect in its cruise control system, we find no abuse of discretion in excluding such evidence in the Manigaults' case-in-chief.
We turn next to whether the evidence should have been admissible in rebuttal because Ford opened the door when it improperly told the jury that no other incidents of sudden acceleration had ever occurred by stating that "there will be no evidence from anyone that this has ever happened in the real world[.]" The Manigaults contend that Ford's expert opened the door to the sudden acceleration complaints when he admitted that the cruise control system in the 1987 Crown Victoria was the same system used in millions of Ford vehicles manufactured between 1980 and 1988.
The Manigaults further claim that Ford not only opened the door through which to introduce the other complaints, but that it deliberately misled both the judge and the jury into believing that there had been no other complaints, and that Ford had no prior knowledge that its cruise control system was causing sudden dangerous accelerations. They also claim that Ford misled the jury through its closing argument when it stated:
 Now, Mr. Murray mentioned the risk benefit test. The only evidence we have here is that this cruise control was in tens of millions of vehicles made by Ford alone. If you want to add the other manufacturers in, hundreds of millions, driven for billions and billions of miles. And this defect, this occurrence that they are claiming happened once, maybe twice, even if you want to talk about their church incident, on a car with 113,000 miles, and not on any of these other hundreds of millions of vehicles, through billions of miles, doesn't meet the risk benefit test.
The Manigaults, therefore, conclude that Ford deliberately misled the jury into believing that there had never been another sudden acceleration event in the history of cruise control but, as noted supra, the record shows otherwise. There was evidence through the Manigaults' expert, Sero, that he had investigated a number of other incidents of sudden acceleration and through Ford's expert, DeClercq, who testified about investigating other sudden acceleration complaints and admitted, during cross examination, that Ford had devoted an entire project to investigating a number of complaints concerning a class of vehicles. Indeed, the Manigaults directly addressed this portion of Ford's closing argument during their rebuttal by reminding the jury that there was, in fact, evidence of a number of sudden acceleration complaints beyond this case.
The record reveals that Ford's statements to the jury did not contain claims that the Manigaults had failed to show the existence of other sudden acceleration complaints but, rather, that there was no evidence that any other complaint had been linked to a defect or malfunction in a cruise control unit. In light of all the evidence in the record, we do not believe the jury was misled by Ford's statements in opening or closing arguments, nor by the evidence presented or excluded and find the first and second assignments of error without merit.
The Manigaults' third assignment of error states:
 III. THE TRIAL COURT ERRED BY DENYING THE MANIGAULTS' MOTION FOR A NEW TRIAL.
Here the Manigaults, relying upon the same arguments set forth in the first and second assignments of error, contend that they were entitled to a new trial because of the judge's erroneous evidentiary rulings during trial. For the reasons stated, supra, we find the third assignment of error without merit.
The fourth assignment of error states:
 IV. THE MANIGAULTS ARE ENTITLED TO A NEW TRIAL ON THE BASIS OF JUDGE CALABRESE'S UNREVERSED FINDING THAT THE MANIGAULTS WERE PREJUDICED BY FORD'S MISLEADING REPRESENTATIONS TO THE TRIAL COURT.
Here the Manigaults suggest this court's opinion in Manigault I merely "vacated" Judge Calabrese's grant of Civ.R. 60(B) relief, and left the judge's findings of fact undisturbed. Again, we disagree. Our order expressly reversed the judge's decision, on the grounds that whether Ford had fraudulently concealed records was a matter for this court to decide on appeal. Our determination was based on the fact that Judge Matia was presented with arguments concerning Ford's knowledge of other complaints before he decided to exclude the evidence and, therefore, as already noted in our discussion of the second assignment of error, supra, whether there was misrepresentation of the content or existence of excluded evidence is a decision for this court.
Our previous discussion should suffice to explain why we disagree with Judge Calabrese's finding that:
 Ford's representations to the jury that there had never been a sudden unintended acceleration occurrence in hundreds of millions of vehicles equipped with cruise control systems; that an occurrence similar to the Manigaults' was a purely theoretical possibility; that such an occurrence does not happen in the real world; that there is no evidence that this had ever happened in any other vehicle at any time and that there is nothing to warn about, constitute an intentional misrepresentation that entitles the plaintiffs to relief from judgment pursuant to Ohio Civ.R. 60(B)(3).
Although Ford may have somewhat overstated its position by declaring that the cruise control system in the Manigaults' car was identical to that in "hundreds of millions" of vehicles, including those made by other manufacturers, we stress again that Ford did not deny the existence of sudden acceleration complaints; it denied any link between any such complaint and a defective or malfunctioning cruise control system. The Manigaults have not shown that Ford was not, or is not now, justified in making such a statement. Ford, therefore, could opine that the claim of defective cruise control systems was only theoretical and that there was no need to warn consumers of a theoretical link between sudden acceleration and the cruise control. This assignment of error is without merit.
Because of our disposition of the Manigaults' assignments of error, it is unnecessary to address Ford's cross-assignment of error, which asserts that it was entitled to directed verdict because there was a lack of any evidence of a defect. Ford's cross-assignment of error is moot.
It is ordered that the appellees recover from appellants its costs herein taxed.
This court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 _____________________ JUDGE ANNE L. KILBANE
DIANE KARPINSKI, J., CONCURS;
 TERRENCE O'DONNELL, P.J., CONCURS IN JUDGMENT ONLY.
[1] Apparently the Manigaults failed to respond to discovery and the 1987 Ford being stored by them was either lost or stolen before either defendant had an opportunity to inspect it.
[2] Shortly before trial the Manigaults reached a settlement with Mullinax Ford and claims against it were dismissed.